**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**CASE NO.  1:22-cv-07929-LJL**

LIBERTY HAULERS, INC.,
LIBERTY HAULERS OF PA, INC.,
JAMES MADISON CONSTRUCTION, INC.,
JAMES D. UHLINGER, JR. and
BRIANNA T. UHLINGER,

        Plaintiffs,

  v.

FORA FINANCIAL ADVANCE LLC,
FOX CAPITAL GROUP INC.,
VELOCITY CAPITAL GROUP LLC,
FINCOAST CAPITAL, LLC,
CLOUDFUND LLC,
LG FUNDING LLC,
NEWCO CAPITAL GROUP VI LLC,
MCA SERVICING LLC,
GREEN GRASS HOLDINGS, LLC,
WIN CAP FUNDING LLC
d/b/a SKYFALL FUNDING,
LEGEND ADVANCE FUNDING II, LLC
SKYIANCE INC.,
EBF HOLDINGS, LLC,
SILVERLINE SERVICES INC.,
CUCUMBER CAPITAL LLC,
ACE FUNDING SOURCE LLC, and
JOHN and JANE DOE DEFENDANTS,

        Defendants,

## **COMPLAINT**

Plaintiffs, LIBERTY HAULERS, INC., LIBERTY HAULERS OF PA, INC., JAMES

MADISON CONSTRUCTION, INC., JAMES D. UHLINGER, JR. and BRIANNA T.

UHLINGER (collectively, Plaintiffs) sue Defendants, FORA FINANCIAL ADVANCE LLC,

FOX CAPITAL GROUP INC., VELOCITY CAPITAL GROUP LLC, FINCOAST CAPITAL, LLC, CLOUDFUND LLC, LG FUNDING LLC, NEWCO CAPITAL GROUP VI LLC, MCA SERVICING LLC, GREEN GRASS HOLDINGS, LLC, WIN CAP FUNDING LLC d/b/a SKYFALL FUNDING, LEGEND ADVANCE FUNDING II, LLC, SKYIANCE INC., EBF HOLDINGS, LLC, SILVERLINE SERVICES INC., CUCUMBER CAPITAL LLC, and ACE FUNDING SOURCE LLC (collectively, the "Defendants") as well as the John and Jane Doe Defendants (the "John/Jane Doe Defendants") and, in support hereof states as follows:

## SUMMARY OF THE CLAIMS

1.      This lawsuit is brought by three commonly owned companies and their principals, who are husband and wife.  Each of the Defendants are business funders who prey upon their victims by offering them funding in the form of so-called a "merchant cash advance" or "MCA".  MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount a portion of a business's future receivables.

2.      These merchant cash advances are in fact unlawful, usurious loans with interest rates between 80% and over 465% per annum, far above the maximum rate permissible for a loan under New York law.  Defendants deduct daily (or weekly) amounts directly from one of the Plaintiff's bank account(s) regardless of the amount of receipts that Plaintiff earned that day.

3.      To evade applicable usury statutes, each of the Defendants' loans were disguised as a purchase and sale of future receivables agreement, but its terms, conditions and Defendants' actions demonstrate that despite the agreement's form, no sale of receivables took place.  Rather, each agreement was intended to be a loan from inception and each Defendant's conduct and the documents plainly demonstrate that such Defendant is not actually purchasing receivables or future receipts but using this false construct to hide an unlawful loan transaction.

4.      While it is bad enough when a merchant/business has one or two merchant cash advances, the harm is multiplied and compounded in situations like the within case where a business is forced to take second MCA in order to keep up the payments on the first MCA, then a third MCA to keep up the payments on the first and second MCAs and to keep the business afloat by replacing the money being automatically deducted each day from the company's bank account by other funders regardless of such company's daily receipts.

5.      Before long, the three companies owned and controlled by the individual Plaintiffs, Mr. and Mrs. Uhlinger, collectively had 18 different MCA agreements, and the Defendants were collectively debiting the companies' bank accounts over $21,000.00 per day (or nearly $108,000.00 per week) – a sum more than each company was earning.

6.      This case is indicative of the abuses in this industry and how such abuses resulted in a downward spiral of unending debt for Mr. and Mrs. Uhlinger and their companies.  Rather than shut down their business or be forced into bankruptcy (for both their businesses and individual bankruptcies as a result of personal guarantees of each of these unlawful loans), Plaintiffs turn to this Court for much-needed relief.

7.      It is against this backdrop that Plaintiffs bring claims against these MCA-funder Defendants (including the John and Jane Doe Defendants) sounding in RICO, racketeering conspiracy and breach of contract.

## **THE PARTIES**

8.      Plaintiff, LIBERTY HAULERS, INC. ("Liberty Haulers") is a New York corporation, with its principal place of business in Jefferson County, New York.

9.      Plaintiff, LIBERTY HAULERS OF PA, INC. ("Liberty Haulers of PA"), is a Pennsylvania corporation, with its principal place of business in Franklin County, Pennsylvania.

10.      Plaintiff, JAMES MADISON CONSTRUCTION, INC. ("JMC") is a New York corporation, with its principal place of business in Jefferson County, New York.

11.     Plaintiff, JAMES D. UHLINGER, JR. ("Mr. Uhlinger") resides in, and is a citizen of, the State of New York.

12.     Plaintiff, BRIANNA T. UHLINGER, JR. ("Mrs. Uhlinger") resides in, and is a citizen of, the State of New York.

13.     Defendant, FORA FINANCIAL ADVANCE LLC ("Fora Financial"), is a New York corporation with its principal place of business located in New York County, New York.

14.     Defendant, FOX CAPITAL GROUP INC. ("Fox Capital"), is a Florida limited liability company with its principal place of business located in Hallandale, Broward County, Florida.

15.     Defendant, VELOCITY CAPITAL GROUP LLC ("Velocity Capital"), is a New York limited liability company with its principal place of business located in Nassau County, New York.

16.     Defendant, FINCOAST CAPITAL, LLC ("Fincoast Capital"), is a Delaware limited liability company with its principal place of business located in Wilmington, New Castle County, Delaware.

17.     Defendant, CLOUDFUND LLC ("Cloudfund"), is a New York limited liability company with its principal place of business located in Rockland County, New York.

18.     Defendant, LG FUNDING LLC ("LG Funding"), is a New York limited liability company with its principal place of business located in Kings County, New York.

19.     Defendant, NEWCO CAPITAL GROUP VI LLC ("Newco Capital"), is a New York limited liability company with its principal place of business located in New York County, New York.

20.     Defendant, MCA SERVICING LLC ("MCA Servicing"), is a New York limited liability company with its principal place of business located in Nassau County, New York.

21.     Defendant, GREEN GRASS HOLDINGS, LLC ("Green Grass"), is a Delaware

limited liability company with its principal place of business located in Kings County, New York.

22.     Defendant, WIN CAP FUNDING LLC, is a Connecticut limited liability company with its principal place of business located in Fairfield County, New York and does business under the trade name "Skyfall Funding" ("Skyfall Funding").

23.     Defendant, LEGEND ADVANCE FUNDING II, LLC ("Legend Advance"), is a Delaware limited liability company with its principal place of business located in New York County, New York.

24.     Defendant, SKYINANCE INC. ("Skyinance"), is a Delaware corporation with its principal place of business located in Rockland County, New York.

25.     Defendant, EBF HOLDINGS, LLC, is a Delaware limited liability company with its principal place of business located in Nassau County, New York and does business under the trade name Everest Business Funding ("Everest").

26.     Defendant, SILVERLINE SERVICES INC. ("Silverline"), is a New York corporation with its principal place of business located in Nassau County, New York.

27.     Defendant, CUCUMBER CAPITAL LLC ("Cucumber Capital"), is a New York limited liability company with its principal place of business located in Nassau County, New York.

28.     Defendant, ACE FUNDING SOURCE LLC ("Ace Funding"), is a New York limited liability company with its principal place of business located in Albany County, New York.

29.     The John/Jane Doe Defendants are the various officers and owners of each of the Defendants, as well as the investors in these corporate Defendants, who participated in this illegal scheme and whose identities will be sought during the course of discovery in this case.

## JURISDICTION AND VENUE

30.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

31.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

32.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

33.    All conditions precedent to the bringing of this action have occurred, been performed or have been otherwise waived.

## GENERAL ALLEGATIONS

34.    All three corporate Plaintiffs, Liberty Haulers, Liberty Haulers of PA, and JMC, are business entities owned and controlled by the individual Plaintiffs, Mr. and Mrs. Uhlinger.

35.    Liberty Haulers is a licensed and Department of Transportation registered trucking company running freight hauling with its headquarters in Carthage, New York.

36.    Liberty Haulers of PA is also a licensed and Department of Transportation registered trucking company running freight hauling with its headquarters in Greencastle, Pennsylvania.

37.    JMC provides asphalt/blacktop paving services throughout New York State and Pennsylvania and has been doing so for over 25 years.

38.    Like many other small businesses, Liberty Haulers, Liberty Haulers of PA, and JMC suffered financially in recent years, especially during the heart of the pandemic.

39.    While these companies had previously relied primarily on traditional lenders, they recently fell victim to a group of funders who provide what has been called payday loans for

business called merchant cash advances.

40.    Defendants loan money to merchants, like Liberty Haulers, Liberty Haulers of PA, and JMC, under the guise of a merchant cash advance, which they describe as a 'purchase and sale of future receivables.' As a general matter, an issuer of a merchant cash advance provides a merchant with a lump sum payment in exchange for a share of the merchant's future sales income/receipts, or "receivables," up to a certain total repayment amount.

41.    As a result, unlike a loan, a true merchant cash advance does not guarantee an issuer with a regular payment or a fixed, finite term.  Instead, payment amounts may vary through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with the merchant's actual receivables.  Because payment amounts vary, the lengths of repayment terms also vary.

42.    This variability and lack of security create certain risks for funders but also create certain protections for merchants by being able to reduce required payments when business is slow.

43.    In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term.  In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), New York law guarantees certain protections to loan borrowers, including a maximum annual interest rate of 16%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

44.    The Defendants herein attempt to style their transactions as a 'purchases of future receivables' in order to evade New York's 16% interest rate cap and the other legal protections and requirements that exist for loans.  But in fact, each of the Defendant's transactions function as loans, and, as a result, their customers are entitled to the protections afforded to borrowers under New York law.

7

45.     The title to the agreements is a sham.   In form, substance and in every conceivable way, each of the Defendant's agreements function as absolutely repayable loans with interest rates exceeding 80% and up to over 460% per annum.

46.     Each of the Defendants market and collect upon their cash advances as loans. They each require the recipient of the funding (here each of the business entity plaintiffs) to repay the loans through fixed daily or weekly payments, which are debited from the company's bank accounts at set amounts ranging here from $353.00 per day to a whopping $5,000.00 per day.  They require the loans to be repaid in short terms (anywhere from approximately 45 days to 9 months for these Defendants), at annual interest rates well above the 16% threshold that defines usury under New York law.  In fact, the annual interest rates charged by Defendants here regularly exceed 100% – and in some cases over 460% annually.

47.     Unlike a true purchase of future receivables, Defendants do not set the daily payment amount as an actual, reality-based, percentage of one of the Plaintiff's daily receipts, but they set the daily (or weekly) payment amount solely upon the term/length of the loan within which such Defendant wants to be repaid.

48.     In other words, while each of the Defendants had access, prior to preparing their form contract and prior to the funding, to all of the necessary financial records including the bank statements of the Plaintiff company executing the MCA agreement, none of the Defendants actually tailored the daily payment amount to such Plaintiff company's actual receipts.  Rather, they pretend to do so in order to circumvent laws designed to protect companies like Plaintiffs.

49.     Each Defendant's funding agreements contains the following:

      a.   The amount of future receivables that the Defendant was allegedly purchasing (i.e, Cloudfund was allegedly purchased $74,950.00 of Liberty Hauler's future receivables);

b. The percentage of future receivables allegedly being purchased (i.e., Cloudfund allegedly purchased 49% of Liberty Hauler's future receivables);

c. The amount the funder was to pay to the company for the future receivables (i.e., Cloudfund agreed to pay $50,000.00);[1] and

d. The daily amount to be removed via ACH from the bank account of NRE (i.e., Cloudfund was to debit the account in the amount of $808.00 daily, which would mean the amount would be repaid in 93 daily payments (roughly, a 4-month term).

50.     To further evidence that the 'specified percentage of receivables purchased' what just an artifice in furtherance of pretending that each MCA-funder Defendant was purchasing a fixed and specific set of receivables, each of the corporate Plaintiffs (Liberty Haulers, Liberty Haulers of PA and JMC) at any given time had already sold over 100% of its daily receipts. Thus, there was nothing for many of the Defendants to have purchased.

51.     During the four-month period from January 27, 2022 to May 20, 2022, Defendants Fora Financial, Fox Capital, Velocity Capital, Fincoast Capital, Cloudfund and non-party, Forward Financial (who is not being sued herein because of a mandatory arbitration provision) collectively purchased 113% of Liberty Hauler's daily receivables. This is more than a company can possibly sell if the MCA agreements were actually based in reality and were truly a purchase of future daily receipts. As part of an MCA funder's pre-funding due diligence process, each MCA-funder Defendant obtained the last three or six months of a company's bank

_____

[1] In every case, Defendants never actually funded the amount set forth in the agreement. There were always deductions before the alleged purchase price was wire transferred to the Plaintiff company for items such as underwriting fees, origination fees, ACH set-up fees, due diligence fees, etc. Taking the example of Cloudfund, while the purchase price was set at $50,000, only $46,924.00 was actually funded. A classic bait and switch.

statements (in most cases, this is the total extent of the due diligence each Defendant conducts). Thus, each subsequent funder was aware of each of the previous/existing agreements since they would be able to see from the bank statements and financial information submitted that, at the time, each Plaintiff was already paying other MCA lenders on a daily basis. This alone should demonstrate how the entire 'purchase of future receivables' concept was a farce since it is impossible for one company sell over 100% of its daily receivables.

52.     The same holds true for both Liberty Funders of PA and JMC.

53.     During the approximately two-month period from May 10, 2022 to July 6, 2022, Fox Capital, LG Funding, Newco Capital, MCA Servicing, Green Grass and Skyfall Funding allegedly collectively pretended to purchase 115% of Liberty Funders of PA's daily receipts (which is, of course, impossible).

54.     During the approximately two-month period from April 26, 2022 to June 29, 2022, Fox Capital, Legend Advance, Newco Capital, Skyiance, Everest, Silverline, Cucumber Capital and Ace Funding allegedly collectively pretended to purchase over 106% of JMC's daily receipts (which is, of course, impossible).

A.     **Specifics About the Merchant Cash Advance Lenders**

55.     Detailed below are the contractual agreements between each Plaintiff and each of the MCA-funder Defendants.

**Liberty Haulers' MCAs**

**Fora Funding**

56.     On or about January 27, 2022, Fora Financial loaned Liberty Haulers the sum of $33,400.00. In exchange, Liberty Haulers was required to re-pay the sum of $43,420.00 over a 6-month period. Fora Funding only funded $32,565, attributing $835.00 to a "processing fee". See Exhibit A.

57.     If annualized, the rate of interest on the money provided by Fora Funding is approximately 97% per annum.

58.     Fora Funding required that Liberty Haulers sign an authorization so that it would be paid via automatic deductions from Liberty Haulers' bank account in the sum of $353.01 per day.  See Exhibit A.

59.     According to Fora Funding's agreement, it pretended to be purchasing 15% of Liberty Haulers' future income/receipts.

60.     Fora Funding also required a personal guaranty from Mrs. Uhlinger, the President of Liberty Haulers.

### **Fox Capital**

61.     On or about March 29, 2022, Fox Capital loaned Liberty Haulers the sum of $100,000.00.  In exchange, Liberty Haulers was required to re-pay the sum of $144,000.00 over an approximate 8-month period.  Fox Capital only funded $95,705.00, attributing $4,000.00 to the cost of origination and setting up the ACH deductions and $295.00 to an underwriting fee.  See Exhibit B.

62.     If annualized, the rate of interest on the money provided by Fox Capital is approximately 106% per annum.

63.     Fox Capital required that Liberty Haulers sign an authorization so that it would be paid via automatic deductions from Liberty Haulers' bank account in the sum of $800.00 per day.  See Exhibit B.

64.     According to Fox Capital's agreement, it pretended to be purchasing 15% of Liberty Haulers' future income/receipts.

65.     Fox Capital also required a personal guaranty from Mrs. Uhlinger, the President of Liberty Haulers.

66.     Fox Capital also took a security interest in ALL of Liberty Haulers' assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Velocity Capital**

67.     On or about May 20, 2022, Velocity Capital loaned Liberty Haulers the sum of $35,000.00.  In exchange, Liberty Haulers was required to re-pay the sum of $51,800.00 over an approximate 5-month period.  Velocity Capital only funded $32,550.00, attributing $1,225.00 to an underwriting fee and another $1,225.00 to an origination fee.  See Exhibit C.

68.     If annualized, the rate of interest on the money provided by Velocity Capital is approximately 176% per annum.

69.     Velocity Capital required that Liberty Haulers sign an authorization so that it would be paid via automatic deductions from Liberty Haulers' bank account in the sum of $470.91 per day.  See Exhibit C.

70.     According to Velocity Capital's agreement, it pretended to be purchasing 20% of Liberty Haulers' future income/receipts.

71.     Velocity Capital also required a personal guaranty from Mrs. Uhlinger, the President of Liberty Haulers.

72.     Velocity Capital also took a security interest in ALL of Liberty Haulers' assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Fincoast Capital**

73.     On or about May 20, 2022, Fincoast Capital loaned Liberty Haulers the sum of $65,075.86.  In exchange, Liberty Haulers was required to re-pay the sum of $94,360.00 over an approximate 7-month period.  Fincoast Capital only funded $63,448.96, attributing $1,629.90 to an origination fee.  See Exhibit D.

74.    If annualized, the rate of interest on the money provided by Fincoast Capital is approximately 80% per annum.

75.    Fincoast Capital required that Liberty Haulers sign an authorization so that it would be paid via automatic deductions from Liberty Haulers' bank account in the sum of $674.00 per day.  See Exhibit D.

76.    According to Fincoast Capital's agreement, it pretended to be purchasing 3.69% of Liberty Haulers' future income/receipts.

77.    Fincoast Capital also required a personal guaranty from Mrs. Uhlinger, the President of Liberty Haulers.

78.    Fincoast Capital also took a security interest in ALL of Liberty Haulers' assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### Cloudfund

79.    On or about May 20, 2022, Cloudfund loaned Liberty Haulers the sum of $50,00.00.  In exchange, Liberty Haulers was required to re-pay the sum of $74,950.00 over an approximate 4-month period.  Cloudfund only funded $46,924.00, attributing $1,500.00 to a due diligence fee and another 1,500.00 to an origination fee.  See Exhibit E.

80.    If annualized, the rate of interest on the money provided by Cloudfund is approximately 221% per annum.

81.    Cloudfund required that Liberty Haulers sign an authorization so that it would be paid via automatic deductions from Liberty Haulers' bank account in the sum of $808.00 per day.  See Exhibit E.

82.    According to Cloudfund's agreement, it pretended to be purchasing 49% of Liberty Haulers' future income/receipts.

83.     Cloudfund also required a personal guaranty from both Mr. Uhlinger and Mrs. Uhlinger.

84.     The following summary of three of MCA loans described above provides further evidence that both the daily payment amount and the percentage of receivables purchased are numbers simply reverse-engineered by the MCA funder to fit into the time period/term within which the MCA funder wants to be re-paid:

| Date of Funding | MCA Funder | Percentage of Receivables 'Purchased' | Daily Payment |
|---|---|---|---|
| 5/20/22 | Velocity Capital | 20% | $491.91 |
| 5/20/22 | Fincoast Capital | 3.69% | $674.00 |
| 5/20/22 | Cloudfund | 49% | $808.00 |

Thus, while all MCA funders examine the prospective borrower's bank statements (and often times this is the extent of the due diligence an MCA funder performs), Velocity Capital determined that 20% of Liberty Hauler's daily revenue is $491.91, Fincoast Capital determined that 3.69% of Liberty Hauler's daily revenue (a number roughly 1/5 of Velocity Capital's figure) is a higher amount ($674.00) and Cloudfund determined that 49% of Liberty Hauler's daily revenue is $808.00.  Each of these MCA funders issued their funding on the same exact date but the pretend math employed by each of them resulted in vastly different results.  Again, this shows that the 'purchase of future receivables' construct that they MCA funders are using is simply a subterfuge to hide the fact they are actually issuing criminally usurious loans.

**Liberty Haulers of PA's MCAs**

**LG Funding**

85.     On or about May 10, 2022, LG Funding loaned Liberty Haulers of PA the sum of $115,000.00.  In exchange, Liberty Haulers of PA was required to re-pay the sum of $162,150.00

over an approximate 6-month period.   LG Funding only funded $112,650.00, attributing $2,350.00 to the cost of underwriting and setting up the ACH deductions.  See Exhibit F.

86.     If annualized, the rate of interest on the money provided by LG Funding is approximately 90% per annum.

87.     LG Funding required that Liberty Haulers of PA sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $901.00 per day.  See Exhibit F.

88.     According to LG Funding's agreement, it pretended to be purchasing 10% of Liberty Haulers of PA's future income/receipts.

89.     LG Funding also required a personal guaranty from Mr. Uhlinger, the President of Liberty Haulers of PA.

90.     LG Funding also took a security interest in ALL of Liberty Haulers of PA's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### Newco Capital

91.     On or about May 24, 2022, Newco Capital loaned Liberty Haulers of PA the sum of $100,000.00.   In exchange, Liberty Haulers was required to re-pay the sum of $142,000.00 over an approximate 8-month period.   Newco Capital only funded $96,500.00, attributing $1,750.00 as an origination fee and an ACH set up fee and another $1,750.00 as an underwriting fee.  See Exhibit G.

92.     If annualized, the rate of interest on the money provided by Newco Capital is approximately 102% per annum.

93.     Newco Capital required that Liberty Haulers of PA sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $947.00 per day.  See Exhibit G.

94.     According to Newco Capital's agreement, it pretended to be purchasing 15% of Liberty Haulers of PA's future income/receipts.

95.     Newco Capital also required a personal guaranty from Mr. Uhlinger, the President of Liberty Haulers of PA.

96.     Newco Capital also took a security interest in ALL of Liberty Haulers of PA's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### MCA Servicing

97.     On or about May 27, 2022, MCA Servicing loaned Liberty Haulers of PA the sum of $75,000.00.   In exchange, Liberty Haulers of PA was required to re-pay the sum of $106,500.00 over a 6-month period.  MCA Servicing only funded $72,374, attributing $1,313.00 as an origination fee and an ACH set up fee and another $1,313.00 as an underwriting fee.  See Exhibit H.

98.     If annualized, the rate of interest on the money provided by MCA Servicing is approximately 133% per annum.

99.     MCA Servicing required that Liberty Haulers of PA sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $888.00 per day.  See Exhibit H.

100.    According to MCA Servicing's agreement, it pretended to be purchasing 15% of Liberty Haulers of PA's future income/receipts.

101.    MCA Servicing also required a personal guaranty from Mr. Uhlinger, the President of Liberty Haulers of PA.

102.    MCA Servicing also took a security interest in ALL of Liberty Haulers of PA's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Green Grass**

103.     On or about June 17, 2022, Green Grass loaned Liberty Haulers of PA the sum of $61,100.00.  In exchange, Liberty Haulers of PA was required to re-pay the sum of $92,300.00 over a 5-month period.   MCA Servicing only funded $72,374, attributing $1,950.00 as an origination fee and an ACH set up fee and another $1,950.00 as an underwriting fee.  See Exhibit I.

104.     If annualized, the rate of interest on the money provided by MCA Servicing is approximately 155% per annum.

105.     Green Grass required that Liberty Haulers of PA sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $840.00 per day.  See Exhibit I.

106.     According to Green Grass's agreement, it pretended to be purchasing 15% of Liberty Haulers of PA's future income/receipts.

107.     Green Grass also required a personal guaranty from Mr. Uhlinger, the President of Liberty Haulers of PA.

108.     Green Grass also took a security interest in ALL of Liberty Haulers of PA's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Fox Capital**

109.     On or about July 6, 2022, Fox Capital loaned Liberty Haulers of PA the sum of $85,000.00.  In exchange, Liberty Haulers of PA was required to re-pay the sum of $123,250.00 over an approximate 5-month period.  Fox Capital only funded $80,705.00, attributing $4,000.00 to the cost of origination and setting up the ACH deductions and $295.00 to an underwriting fee.  See Exhibit J.

110.    If annualized, the rate of interest on the money provided by Fox Capital is approximately 166% per annum.

111.    Fox Capital required that Liberty Haulers of PA sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $1,200.00 per day.  See Exhibit J.

112.    According to Fox Capital's agreement, it pretended to be purchasing 15% of Liberty Haulers of PA's future income/receipts.

113.    Fox Capital also required a personal guaranty from Mr. Uhlinger, the President of Liberty Haulers of PA.

114.    Fox Capital also took a security interest in ALL of Liberty Haulers of PA's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### Skyfall Funding

115.    On or about July 6, 2022, Skyfall Funding entered into an agreement to loan Liberty Haulers of PA the sum of $100,000.00.   In exchange, Liberty Haulers of PA was required to re-pay the sum of $149,990 via 30 daily payments of $5,000.00.  See Exhibit K.

116.    Skyfall Funding never actually funded the full $100,000.00 under its MCA agreement and, instead, funded only $52,000.00 claiming that the balance would be funded in a few days.  But the balance was never funded.

117.    If annualized, the rate of interest on the money provided by Skyfall Funding (even if they had funded the full $100,000.00 promised, is approximatively 467%.

118.    According to Skyfall Funding's agreement, it pretended to be purchasing 45% of Liberty Haulers of PA's future income/receipts.

119.    Skyfall Funding also required a personal guaranty from Mr. Uhlinger, the President of Liberty Haulers of PA.

Skyfall Funding also took a security interest in ALL of Liberty Haulers of PA's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### JMC's MCAs

#### Fox Capital

120. On or about April 26, 2022, Fox Capital loaned JMC the sum of $150,000.00. In exchange, JMC was required to re-pay the sum of $208,500.00 over an approximate 9-month period. Fox Capital only funded $202,205.00, attributing $6,000.00 to the cost of origination and setting up the ACH deductions and $295.00 to an underwriting fee. See Exhibit L.

121. If annualized, the rate of interest on the money provided by Fox Capital is approximately 86% per annum.

122. Fox Capital required that JMC sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $1,158.33 per day. See Exhibit L.

123. According to Fox Capital's agreement, it pretended to be purchasing 15% of JMC's future income/receipts.

124. Fox Capital also required a personal guaranty from Mr. Uhlinger, the President of JMC.

125. Fox Capital also took a security interest in ALL of JMC's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

#### Legend Advance

126. On or about April 26, 2022, Legend Advance loaned JMC the sum of $162,000.00. In exchange, JMC was required to re-pay the sum of $241,380.00 over an

approximate 7-month period.  Legend Advance only funded $161,715.00, attributing the balance to miscellaneous fees.  See Exhibit M.

127.    If annualized, the rate of interest on the money provided by Legend Advance is approximately 111% per annum.

128.    Legend Advance required that JMC sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $7,183.93 per week.  See Exhibit M.

129.    According to Legend Advance's agreement, it pretended to be purchasing 15% of JMC's future income/receipts.

130.    Legend Advance also required a personal guaranty from Mr. Uhlinger, the President of JMC.

### Newco Capital

131.    On or about June 6, 2022, Newco Capital loaned JMC the sum of $100,000.00.  In exchange, JMC was required to re-pay the sum of $147,000.00 over an approximate 8-month period.  Newco Capital only funded $142,000.00, attributing $2,500.00 as an origination fee and an ACH set up fee and another $2,500.00 as an underwriting fee.  See Exhibit N.

132.    If annualized, the rate of interest on the money provided by Newco Capital is approximately 114% per annum.

133.    Newco Capital required that JMC sign an authorization so that it would be paid via automatic deductions from Liberty Haulers of PA's bank account in the sum of $865.00 per day.  See Exhibit N.

134.    According to Newco Capital's agreement, it pretended to be purchasing 15% of JMC's future income/receipts.

135.    Newco Capital also required a personal guaranty from Mr. Uhlinger, the President of JMC.

136.    Newco Capital also took a security interest in ALL of JMC's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### Skyinance

137.    On or about June 9, 2022, Skyinance loaned JMC the sum of $60,000.00.   In exchange, JMC was required to re-pay the sum of $87,000.00 over an approximate 5-month period.  Skyinance only funded $57,600.00, attributing $1,200.00 as an origination fee and an ACH set up fee and another $1,200.00 as an underwriting fee.  See Exhibit O.

138.    If annualized, the rate of interest on the money provided by Skyinance is approximately 166% per annum.

139.    Skyinance required that JMC sign an authorization so that it would be paid via automatic deductions from JMC's bank account in the sum of $870.00 per day.  See Exhibit O.

140.    According to Skyinance's agreement, it pretended to be purchasing 21% of JMC's future income/receipts.

141.    Skyinance also required a personal guaranty from Mr. Uhlinger, the President of JMC.

142.    Skyinance also took a security interest in ALL of JMC's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### Everest

143.    On or about June 9, 2022, Everest loaned JMC the sum of $80,000.00.   In exchange, JMC was required to re-pay the sum of $116,000.00 over an approximate 9-month period.  Everest only funded $78,260.00, attributing $1,740.00 as an origination fee, a funding fee and an ACH set up fee.  See Exhibit P.

144.    If annualized, the rate of interest on the money provided by Everest is approximately 98% per annum.

145.    Everest required that JMC sign an authorization so that it would be paid via automatic deductions from JMC's bank account in the sum of $644.44.00 per day.  See Exhibit P.

146.    According to Everest's agreement, it pretended to be purchasing 15% of JMC's future income/receipts.

147.    Everest also required a personal guaranty from Mr. Uhlinger, the President of JMC.

**Silverline**

148.    On or about June 23, 2022, Silverline loaned JMC the sum of $50,000.00.  In exchange, JMC was required to re-pay the sum of $73,950.00 over an approximate 5-month period.  Silverline only funded $47,500.00, attributing $730.00 as an origination fee and an ACH set up fee and another $1,770.00 as an underwriting fee.  See Exhibit Q.

149.    If annualized, the rate of interest on the money provided by Silverline is approximately 238% per annum.

150.    Silverline required that JMC sign an authorization so that it would be paid via automatic deductions from JMC's bank account in the sum of $999.32 per day.  See Exhibit Q.

151.    According to Silverline's agreement, it pretended to be purchasing 15% of JMC's future income/receipts.

152.    Silverline also required a personal guaranty from Mr. Uhlinger, the President of JMC.

153.    Silverline also took a security interest in ALL of JMC's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Cucumber Capital**

154.     On or about June 29, 2022, Cucumber Capital loaned JMC the sum of $60,000.00. In exchange, JMC was required to re-pay the sum of $89,940.00 over an approximate 4-month period.   Silverline only funded $57,000.00, attributing $1,500.00 as a due diligence fee and another $1,500.00 as an ACH program fee.  See Exhibit R.

155.     If annualized, the rate of interest on the money provided by Cucumber Capital is approximately 221% per annum.

156.     Cucumber Capital required that JMC sign an authorization so that it would be paid via automatic deductions from JMC's bank account in the sum of $1,124.25 per day.  See Exhibit R.

157.     According to Cucumber Capital's agreement, it pretended to be purchasing 6% of JMC's future income/receipts.

158.     Cucumber Capital also required a personal guaranty from Mr. Uhlinger, the President of JMC.

159.     Cucumber Capital also took a security interest in ALL of JMC's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Ace Funding**

160.     On or about June 27, 2022, Ace Funding loaned JMC the sum of $40,000.00.  In exchange, JMC was required to re-pay the sum of $59,960.00 over an approximate 4-month period.   Silverline only funded $36,000.00, attributing $4,000.00 to an origination fee.  See Exhibit S.

161.     If annualized, the rate of interest on the money provided by Ace Funding is approximately 221% per annum.

162.    Ace Funding required that JMC sign an authorization so that it would be paid via automatic deductions from JMC's bank account in the sum of $714.00 per day.  See Exhibit S.

163.    According to Ace Funding's agreement, it pretended to be purchasing 12% of JMC's future income/receipts.

164.    Ace Funding also required a personal guaranty from Mr. Uhlinger, the President of JMC.

165.    Ace Funding also took a security interest in ALL of JMC's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**B.**    **The MCA Agreement Are Substantively and Procedurally Unconscionable**

166.    Each of the MCA Agreements described above (the "MCA Agreements") are unconscionable contracts of adhesion that are not negotiated at arms-length.

167.    Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions (collectively the "Transactions"), including those involving these Plaintiffs, are really loans.

168.    Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of

24

obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to [the Enterprise]," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

169.    The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until a specified day of each month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

170.    The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, some of the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just a few fixed daily payments.

### C.    The MCA Agreements Each Uses a Sham Reconciliation Provision to Disguise the Loans.

171.    In order to evade New York usury laws, each of the MCA-funder Defendants includes a sham reconciliation provision in the MCA Agreements to give the appearance that the loans do not have a definite term.

172.    Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

173.    For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

174.    In order to ensure that a merchant can never use their sham reconciliation provision, however, each of the MCA-funder Defendants falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

175.    For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

176.    On information and belief, none of the MCA-funder Defendants actually has a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

177.    In fact, each of the MCA Agreements specifically requires the MCA funder to affirmatively reconcile the accounts each month but never do.

26

**D.**    **The Defendants Intentionally Disguised the True Nature of the Transactions**.

178.    Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)    The daily payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold the Plaintiffs absolutely liable for repayment of the purchased amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, the Plaintiffs were in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)    While the MCA Agreements purported to "assign" all of the Plaintiffs' future account receivables to the MCA-funder Defendant until the purchased amount was paid, the Plaintiffs retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the MCA-funder Defendants merely acquired a security interest in the Plaintiff's accounts to secure payment of the purchased amount;

(d)    Unlike true receivable purchase transactions, the Transactions were underwritten based upon an assessment of each of the Plaintiff's credit worthiness; not the creditworthiness of any account debtor;

27

(e)     The purchased amount was not calculated based upon the fair market value of each of the Plaintiff's future receivables, but rather was unilaterally dictated by the MCA-funder Defendant based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, none of the MCA-funder Defendants ever requested any information concerning the Plaintiff's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the daily payments was determined based upon when the MCA-funder Defendant wanted to be paid, and not based upon any good-faith estimate of the Plaintiff's future account receivables;

(g)     None of the MCA-funder Defendants assumed a risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Plaintiff's bank account constituted a default under the agreements;

(h)     The MCA-funder Defendant required that each Plaintiff undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the MCA-funder Defendant from any risk of loss resulting from the Plaintiff's failure to generate and collect receivables; and

(i)     Each of the MCA-funder Defendants required that the merchant grant it a security interest in its receivables and other intangibles (and many in equipment, inventory and other assets) and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the MCA-funder Defendants knew were breached from day one.

28

179.    The MCA-funder Defendants also show in each of its underwriting practices that their agreements are loans.   Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.   When underwriting new transactions including those entered into with the Plaintiffs herein, none of the MCA-funder Defendants evaluated the Plaintiff's receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a Plaintiff's credit ratings and bank deposits over a 3 or 6 month period (if they perform any due diligence at all).

180.    When the MCA-funder Defendants collect upon their agreements, it treats them just like loans.   For example, each MCA-funder Defendant requires that the Plaintiff with whom it entered into an MCA Agreement make fixed daily payments and grant security interests to the MCA-funder Defendant in all or substantially all of the Plaintiff's assets to ensure that the daily payments are made.

181.    Many of the MCA-funder Defendants also require that the Plaintiffs execute confessions of judgment that the MCA-funder Defendant could file if the Plaintiff fails to make as few as two daily payments under their agreements.   In other words, the MCA-funder Defendant structures its transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

182.    Each of the Plaintiffs fell victim to all of these predatory tactics.

**E.    Each of the MCA Agreement Were Not Sales of Future Receipts**.

183.    The terms and conditions of many of the MCA Agreements are identical and, if not, substantially similar.

184.    Notwithstanding their titles, the MCA Agreements were not the sale/purchase of receivables.   Plain and simple, there were loans.

185. The MCA Agreements have none of indicia of a true sale and all the indicia of a loan. Among other things: (i) the future receipts allegedly purchased by many of the later MCA-funder Defendants had already been sold to an another MCA-funder Defendants under a previously executed agreement (which would be obvious from the daily debits shown on the bank statements that each of the MCA-funder Defendants requested from each Plaintiff); (ii) each of the MCA Agreements failed to transfer the risk and benefits of ownership of the future receipts from a Plaintiff to a MCA-funder Defendant; (iii) each Plaintiff remained absolutely liable for repayment of the 'purchased amounts'; (iv) Each of the MCA-funder Defendants had full recourse rights against one or more of the Plaintiff and their President, Mr. or Mrs. Uhlinger; (v) the daily payments amounts were fixed and required payment within the specific time period chosen by the MCA-funder Defendant; and (vi) each of the MCA Agreements' reconciliation provisions is a sham.

186. By the time that many of the later MCA Agreements were executed between one of the Plaintiffs and one of the MCA-funder Defendants, there were not future receipts left to purchase since that Plaintiff had already purportedly sold over 100% of its daily revenue. This further evidences the nature of the sham.

**F.     The Terms of Each of the MCA Agreement Fail to Transfer the Risks and Benefits of Ownership of Future <u>Receipts from a Plaintiff to a MCA-Funder Defendant</u>**.

187. The *sine qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfer from the seller to the buyer. That did not occur in connection with any of the MCA Agreements or Transactions here.

188. Here, each Plaintiff was responsible for generating and collecting the future receipts, it exercised complete dominion and control over the future receipts and it retained the risk of non-collectability with respect to the future receipts. In other words, notwithstanding the

sale and assignment language of the MCA Agreements, all of the benefits and risks of ownership of the future receipts remained with each Plaintiff.

189.    Pursuant to the each of the MCA Agreements, the pretend seller (one of the Plaintiffs) was responsible for collecting the proceeds of its transactions and depositing a "Specified Percentage" of each transaction into a designated account so that one of the MCA-funder Defendants could debit the daily payments.

190.    So long as it made the daily payments, the pretend seller was free to use the remaining proceeds of any transaction, including the proceeds of a supposedly purchased future receipt, in its daily operations.

191.    Indeed, the excess proceeds were supposedly each Plaintiff's only source of operating capital because each of the MCA Agreements specifically prohibited each Plaintiff from further encumbering the future receipts.  Thus, each Plaintiff had to use the proceeds of the allegedly purchased future receipts in order to operate its business.

192.    Each Plaintiff's complete dominion and control over the future receipts and its right to use the proceeds of the alleged purchased future receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the MCA Agreements were a true sale.

193.    Similarly, each Plaintiff retained the risk of loss associated with non-payment of the future receipts.  Among other things, if a particular future receipt was not collectible, there was no reduction in the purchased amount and each MCA-funder Defendant would be repaid from the next collected future receipt or the proceeds of any other sale transaction.

### G.    Each Plaintiff Remained Absolutely Liable
### for Repayment of the Purchased Amount

194.    By operation of the default rights and remedies under the MCA Agreements, repayment of the purchased amount was put beyond any risk of non-payment and each Plaintiff remained absolutely liable for repayment of the purportedly purchased amounts.

195.    Under each of the MCA Agreements, if an event of default occurred, each of the pretend sellers of the future receipts immediately became liable for the full outstanding purchased amounts, together with additional fees and costs due under the MCA Agreements.

196.    An event of default is defined under the MCA Agreements so that a default would occur under any and every conceivable circumstance wherein the pretend seller failed to generate or collect future receipts to repay the MCA-funder Defendant.

197.    Most importantly, the failure of each Plaintiff (the pretend seller of the future receipts) to generate and collect sufficient revenue to make the daily payments would automatically constitute an Event of Default under each of the MCA Agreements after just a few days of having insufficient funds ("NSF") in the account which is set up for automatically daily ACH debits.

198.    It would also be an Event of Default under each of the MCA Agreements if the Plaintiff/pretend seller of the future receipts: (i) violated any term of the agreements; (ii) transferred or otherwise sold its assets; or (iii) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if a Plaintiff's business was destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, it would be in default of the MCA Agreements and, pursuant to the remedies provided by such Agreement, the the Yes Funding and Cap Call Agreements, FTE would be liable for the Plaintiff/pretend seller of the future receipts would be immediately liable for the full outstanding balance of purchased amount, plus all fees and costs due under the MCA Agreement.

**H.** **Each MCA-Funder Defendant Retained Full Recourse Rights**

199. In order to further ensure its performance under each of the MCA Agreements, each Plaintiff granted each MCA-funder Defendant a security interest in substantially all of its assets including all of its all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory (the "Collateral").

200. Upon an Event of Default, each MCA-funder Defendant was entitled to exercise all of their rights and remedies under the UCC.

201. Thus, if the Plaintiff/pretend seller of the future receipts missed as few daily payments, for any reason whatsoever, the MCA-funder Defendant could foreclose on the Collateral.

202. Additionally, many times, the Plaintiff/pretend seller of the future receipts was required to and did execute confessions of judgment that could be entered if it defaulted under the MCA Agreements.

203. Such recourse provisions are not indicative of a true sale, but rather, a loan.

**I.** **The Daily Payments Were Fixed and Resulted in a Usurious Interest Rate**

204. On the face of each of the MCA Agreements, each Plaintiff was required to repay the pretend 'purchased amount' through daily ACH debits from a designate account as follows:

For Liberty Haulers:

| MCA-Funder Defendant | Date | Purchase Price | Purchased Amount | Daily Payment | No. | Interest Rate |
|---|---|---|---|---|---|---|
| Fora Financial | 1/27/22 | $33,400.00 | $43,420.00 | $353.01 | 123 | 97% |
| Fox Capital | 3/29/22 | $100,000.00 | $144,000.00 | $800.00 | 180 | 106% |
| Velocity Capital | 5/20/22 | $35,000.00 | $51,800.00 | $470.91 | 110 | 176% |
| FinCoast Capital | 5/20/22 | $65,075.86 | $94,360.00 | $674.00 | 140 | 79.9% |
| CloudFund | 5/20/22 | $50,000.00 | $74,950.00 | $808.00 | 93 | 221% |

For Liberty Haulers of PA:

| MCA-Funder Defendant | Date | Purchase Price | Purchased Amount | Daily Payment | No. | Interest Rate |
|---|---|---|---|---|---|---|
| LG Funding | 5/10/22 | $115,000.00 | $162,150.00 | $901.00 | 180 | 90% |
| NewCo Capital | 5/24/22 | $100,000.00 | $142,000.00 | $947.00 | 150 | 102.3% |
| MCA Servicing | 5/27/22 | $75,000.00 | $106,500.00 | $888.00 | 120 | 132.5% |
| Green Grass | 6/17/22 | $65,000.00 | $92,300.00 | $840.00 | 110 | 155.46% |
| Fox Capital | 7/6/22 | $85,000.00 | $123,250.00 | $1,200.00 | 103 | 166% |
| Skyfall | 7/6/22 | $100,000.00 | $149,990 | $5,000.00 | 30 | 467.26% |

For JMC:

| MCA-Funder Defendant | Date | Purchase Price | Purchased Amount | Daily Payment | No. | Interest Rate |
|---|---|---|---|---|---|---|
| Fox Capital | 4/26/22 | $150,000.00 | $208,500.00 | $1,158.33 | 180 | 85.76% |
| Legend Advance | 4/26/22 | $162,000.00 | $241,380.00 | $7,183.93 | 34 Weekly | 110.78% |
| NewCo Capital | 6/7/22 | $100,000.00 | $147,000.00 | $865.00 | 170 | 113.50% |
| Skyinance | 6/10/22 | $60,000.00 | $87,000.00 | $870.00 | 100 | 165.80% |
| Everest | 6/10/22 | $80,000.00 | $116,000.00 | $644.44 | 180 | 97.86 |
| Silverline | 6/28/22 | $50,000.00 | $73,950.00 | $999.32 | 74 | 237.70% |
| Cucumber Capital | 6/29/22 | $60,000.00 | $89,940.00 | $1,124.25 | 80 | 221% |
| Ace Funding | 6/29/22 | $40,000.00 | $59,960.00 | $714.00 | 84 | 221% |

205.    When the so-called "fees" and other forms of disguised interest are taken into account, the interest rates are even greater.

206.    There can be no question that the daily payments under each of the MCA Agreements were fixed.

207.    Under each of the MCA Agreements, each Plaintiff/pretend seller of the future receipts was obligated to repay the Purchased Amount by remitting a concocted 'specified percentage' (usually 15%) of its 'daily receipts' into a specific designated account (the "Designated Account") and the MCA-funder Defendant would debit the daily payment from the Designated Account.

208.    While the daily payments were supposed to equal a specified percentage of Plaintiff/pretend seller's daily receipts, in reality, the daily payments reflected nothing more than how quickly the MCA-funder Defendant wanted to get paid.

209.    The sham is revealed on the face of the MCA Agreements themselves.  Many times, even advances take from different defendants on the same date, each allegedly purchasing 15% of the daily receipts, results in widely different daily payment amounts.

210.    This is true despite the fact that each of the MCA-funder Defendants were given viewing access to Plaintiff/pretend seller's bank accounts "in order to calculate the amount of such payments."  In other words, the MCA-funder Defendants undertook to calculate, on daily basis, what the fixed percentage of the Plaintiff/pretend seller's daily receipts would be and, on or about a certain day of every month, the MCA-funder Defendant was supposed to reconcile their collections with the Plaintiff/pretend seller's actual receipts to ensure that they never collected more than that fixed percentage of the receipts on a monthly basis.

211.    However, despite being given viewing access to the Plaintiff/pretend seller's bank accounts for the express purpose of reconciling them, none of the MCA-funder Defendants ever actually performed any reconciliation of Plaintiff/pretend seller's account nor did they ever intend to do so because the daily payments were not an actual estimate of the fixed percentage of the Plaintiff/pretend seller's daily receipts but rather, they were simply a reflection of how quickly the MCA-funder Defendant wanted to be repaid.

212.    To make matters worse, each Plaintiff/pretend seller of the future receipts actually requested a reconciliation be performed so that the daily payment more accurately reflected the amount of the receipts purchased but each time the MCA-funder Defendant refused to perform the required reconciliation.

J.      **Each Plaintiff and its Businesses, Finances, and Credit
        Have Been Demolished as a Result of Defendants' Conduct**

213.    Each of the Defendants, and the Defendants collectively, inflicted immense

financial and personal harm upon Plaintiffs who they purport to help.  Defendants have pressured

Plaintiffs into deceptive and lopsided agreements, loan money to Plaintiffs at triple-digit interest

rates, wrongly seize large sums from Plaintiffs' bank accounts, which then resulted in each

Plaintiff having to look to other similar merchant cash advance lenders which resulted in the

spiral of unending debt we see here.

214.    Each Defendant is responsible for the usurious, fraudulent, and illegal conduct set

forth herein.

### FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

215.    Plaintiffs adopt and reallege paragraphs 1 through 214 as if fully set forth herein.

**A.      The Unlawful Activity.**

216.    More than a dozen states, including New York, place limits on the amount of

interest that can be charged in connection with providing a loan.

217.    In 1965, the Legislature of New York commissioned an investigation into the

illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

218.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome*

*Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on

Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the

Governor and the public the need for change in both, as well as for change in the immunity

statute, and for provisions making criminal the possession of loan-shark records and increasing

the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce

payment."

219.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

220.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

221.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

222.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

223.    Like here, this was a purely artificial device used by the loanshark to evade the law - an evasion that the Legislature sought to prevent.

224.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

225.    Each of the MCA-funder Defendants, as well as the various officers and owners of each of the MCA-funder Defendants, and the investors in these MCA-funder Defendants, who participated in this illegal scheme (and whose identities will be sought during the course of discovery in this case) are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

226.    At all relevant times, each of the various officers, owners, and investors of each of the MCA-funder Defendants (the "RICO Persons") was, and is, a person that exists separate and distinct from the MCA-funder Defendant itself.

227.    The officers of the MCA-funder Defendants, who will be identified through discovery, manage and direct one or more of the MCA-funder Defendants and knowingly participated in the enterprise and the fraudulent scheme described above.

228.    The owners of the MCA-funder Defendants, who will be identified through discovery, have an ownership interest in one or more of the MCA-funder Defendants and knowingly participated in the enterprise and the fraudulent scheme described above.

229.    The investors of the MCA-funder Defendants, who will be identified through discovery, invest capital into one or more of the MCA-funder Defendants, and receive a significant return on his/her/its investment, and knowingly participated in the enterprise and the fraudulent scheme described above.

230.    Through their operation of the MCA-funder Defendants, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in New York (which has usury laws) and other states that do not have usury laws.

C.    **The Enterprise**

231.    Each of the MCA-Funders, together with its respective as officers, owners and investors, constitute an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (each, an "Enterprise").

232.    Each of the MCA-Funders, together with its respective as officers, owners, and investors, are associated in fact and through relations for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, each Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

233.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or

agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

234.    The debt, including such debt evidenced by the MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

235.    Each MCA-funder Defendant and the various other members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

236.    Each Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the MCA-Funder Defendants within the Enterprise.**

237.    The RICO Persons of each Enterprise have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

The Owners and Officers

238.    The John/Jane Doe Defendants who are the owners and officers are the masterminds of each Enterprise.  They are responsible for the day-to-day operations of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which

of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

239.   In such capacity, the John/Jane Doe Defendants who are the owners and officers of each Enterprise are responsible for creating, approving and implementing the policies, practices and instrumentalities used by each Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Plaintiffs here.

240.   The John/Jane Doe Defendants who are the owners and officers of each Enterprise also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

241.   The John/Jane Doe Defendants who are the owners and officers of each Enterprise have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the owners and investors.

The MCA-Funder Defendants

242.   Each of MCA-funder Defendants is a corporation or limited liability company organized under the laws of the state of New York or such other state of organization/incorporation set forth above.  Each of the MCA-funder Defendants maintains

41

officers, books, records, and bank accounts independent of the John/Jane Doe Defendants who are the owners, officers and investors of each Enterprise.

243.    Each of the MCA-funder Defendants are operated as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud.  Pursuant to his/her/its membership in an Enterprise, the John/Jane Doe Defendants who are the owners and officers of each Enterprise has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with the John/Jane Doe Investor Defendants to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

244.    In this case, the John/Jane Doe Defendants who are the owners and officers of each Enterprise and the John/Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the MCA Agreements; (iii) underwrote the MCA Agreements; (iv) entered into the MCA Agreements; and (v) collected upon the unlawful debt evidenced by the MCA Agreements by effecting daily ACH withdrawals from the bank accounts of one or more of the Plaintiffs.

The John/Jane Doe Investors

245.    The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of MCA-funder Defendants.

246.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing MCA-funder Defendants with

all or a portion of the pooled funds necessary to fund the usurious loans, including the MCA Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

247.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

   **E.**  **Interstate Commerce**

248.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

249.    Specifically, members of each Enterprise maintain offices in either New York, New Jersey, Connecticut and/or Florida and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York and Pennsylvania, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

250.    In the present case, much of the communications between the members of each Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.    Specifically, each Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

   **F.**  **Injury and Causation.**

251.    Each Plaintiff has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

252.     The injuries to each Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

253.     Each Plaintiffs has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

254.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(CONSPIRACY UNDER 18 U.S.C. § 1962(d))**

255.     Plaintiffs adopt and reallege paragraphs 1 through 254 as if fully set forth herein.

256.     Each Defendant has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed, together with the other members of his/her/its Enterprise, to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

257.     By and through each of the Defendants' business relationships with the other members of his/her/its Enterprise, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among such Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants in his/her/its Enterprise were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

258.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of an Enterprise's affairs in order to collect upon unlawful debts,

including the MCA Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in one or more of the Enterprises and its affairs, and each of the

259.    The Defendants who participated in each Enterprise shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements within that Enterprise.

260.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of such Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

261.    The participation and agreement of each of Defendant in the Enterprise was necessary to allow the commission of this scheme.

262.    Each Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

263.    The injuries to each Plaintiff are directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

264.    Each Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

265.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
### (BREACH OF CONTRACT)

266.    Plaintiffs adopt and reallege paragraphs 1 through 214 as if fully set forth herein.

45

267.    Assuming a valid contract existed, each MCA-funder Defendant breached the respective and applicable MCA Agreement by:

      a.  Refusing to reconcile the daily payments and have such payments be a true reflection of the daily receipts based on the amount of receivables allegedly purchased; and

      b.  Not funding the amount required under the respective agreement.

268.    Each Plaintiff suffered damages as a direct and proximate result of MCA-funder Defendant's breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and seek an Order:

a)    Declaring each of the MCA Agreements to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c)    Awarding treble damages;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.

Dated this 14th day of September, 2022.

                Respectfully submitted,


      /s/  John M. Stravato
      **JOHN M. STRAVATO, ESQ.**
      P.O. Box 298
      Bethpage, NY 11714
      Email:      johnmstravato@gmail.com
      Telephone:   (516) 633-2639
      *Trial Counsel for Plaintiffs*